UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at FRANKFORT

CIVIL ACTION NO.  07-38

TINA DILTS, as Ancillary Administratrix and
Personal Representative of the Estate of Rickie Dilts, et al.,                    PLAINTIFFS,

v.                                    **OPINION AND ORDER**

MAXIM CRANE WORKS, L.P., et al.,                                    DEFENDANTS.

\* \* \* \* \* \* \* \* \*

This matter is before the Court on several motions including the Motion for Summary Judgment (Rec. No. 116) filed by the Defendant Maxim Crane Works, LP.[1]  The issue on this motion is whether Maxim should be vicariously liable for the acts of its crane operator or whether another company, United Group Services, Inc. ("UGS, Inc."), a former defendant to this action, should be liable for the crane operator's actions pursuant to the "loaned servant doctrine."

I.    **BACKGROUND.**

In their Complaint, the Plaintiffs assert that Rickie Dilts and Matthew Collins were employed by the Defendant UGS, Inc.  On or about July 28, 2006, Dilts and Collins were assigned to work at Defendant North American Steel's ("NAS") plant in Carroll County, Kentucky.  At the NAS plant, Dilts and Collins were working approximately 80 feet from the ground on the assembly of the roof of a  structure referred to as the "doghouse."

The doghouse is a large steel structure built inside the factory at NAS that houses an electric

---

[1]  The Defendant Maxim has also filed a Motion for Leave to File a 19-Page Reply (Rec. No. 173) to the Motion for Summary Judgment and the Plaintiffs have filed a Motion for Leave to File a Surreply to the Motion for Summary Judgment (Rec. No. 172).  The Court will grant both motions.

arc furnace used to melt stainless steel.  It is made of separate metal panels weighing between 1,000 and 6,000 pounds.  (R. 166, Response, Ex. A, Gunn Dep. at 45; Ex. C, Corrales Dep. at 16). Dilts and Collins were re-setting the roof panel.  The panel was lifted into place on the doghouse by a crane.  Dilts and Collins were on the roof panel when it fell, causing them to fall 80 feet to the concrete floor.  The Plaintiffs assert that Dilts and Collins died as a result of the fall.

The original Plaintiffs in this matter included Sandi Neace, Collins' mother, as the administrator of his estate.  However, pursuant to an Agreed Order (Rec. No. 148), Neace's claims were dismissed.  The remaining plaintiffs in this action are Tinna Dilts, who was Rickie Dilts' wife, and Rickie Dilts, Jr.  Tinna Dilts pursues claims individually, as administrator of Dilts' estate, and as next friend of Dilts' minor children.

The Plaintiffs named five defendants:  UGS, Inc.; NAS; UGS, LLC; Siemens Energy & Automation, Inc.; and Maxim.

There is no dispute on this motion that UGS, Inc. was Dilts' employer. Nor do the parties to this motion dispute that NAS owned the factory where the incident occurred.  As to the movant Maxim's involvement, there is no dispute that the roof panel that fell was lifted and put into place by a crane owned by Maxim. The crane operator was Maxim employee Travis Gunn (Rec. No. 116, Maxim Mot. For Summ. J. at 1).

The Plaintiffs asserted a negligence claim against all of the Defendants. However, by Opinion and Order dated September 22, 2008 (Rec. No. 137), this Court dismissed the Plaintiffs' negligence claims against UGS, Inc., the employer of Dilts, finding that the Plaintiffs received workers' compensation death benefits from UGS, Inc.'s insurance carrier and, thus, they were barred from bringing any tort claim against UGS, Inc. under the exclusivity provision of the Kentucky Workers'

2

Compensation Act, KRS 342.0011, *et seq*.

In its motion, Maxim asserts that the Plaintiffs' sole theory of liability against it is that Maxim is liable for the acts of its crane operator Gunn through the doctrine of "respondeat superior." Under that doctrine, an employer can be held vicariously liable for an employee's actions if the employee committed tortious acts in the scope of his employment. *Papa John's Intern., Inc. v. McCoy*, 244 S.W.3rd 44, 50 (Ky. 2008). The Complaint does not allege any other theory for Maxim's liability and the Plaintiffs do not dispute that this is their sole theory for Maxim's liability.

Maxim now moves for summary judgment in its favor on the negligence claim against it.

## II.     STANDARD.

Under Fed. R. Civ. P. 56, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In considering a motion for summary judgment, the court must view the facts and draw all inferences therefrom in a light most favorable to the nonmoving party. *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The moving party must show conclusively that there

3

is no genuine issue of material fact. *Id.* However, at the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter. *Wiley v. United States*, 20 F.3d 222, 226 (6ᵗʰ Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249(1986)). The Court is not to judge the evidence or make findings of fact. *60 Ivy Street Corp.,* 822 F.2d at 1435-36.   Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

III.    **ANALYSIS.**

In its motion, Maxim appears to assert two reasons the negligence claim against it should be dismissed:  the exclusivity provision of Kentucky's Workers' Compensation Act and the "loaned servant doctrine."  These two defenses can work together and Maxim cites many cases where that has occurred.  For Maxim, however, while it may be shielded from liability for Gunn's actions under the loaned servant doctrine, the exclusivity provision, at least in the manner Maxim has asserted it on summary judgment, cannot provide Maxim a defense.  To demonstrate this, the Court will briefly discuss each of these defenses below.

A.    **The Exclusivity Provision of Kentucky's Workers' Compensation Act.**

The exclusivity provision of the Kentucky's Workers' Compensation Act, KRS 342.0011, *et seq*. provides, in relevant part, the following:

> If an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death. . . .

4

KRS § 342.690(1).

"In other words, an injured employee . . . must elect his remedies; if he chooses to sue under this subsection, he waives any recovery under the workers' compensation laws and if he chooses to make a claim under the workers' compensation laws, he waives his cause of action at common law." *Blanton v. Cooper Industries, Inc.*, 99 F.Supp. 2d 797, 803-04 (E.D.Ky. 2000). Thus, the exclusivity provision provide a defense to a tort claim for the statutory "employer" of the injured employee.

For example, there is no dispute that UGS, Inc. was Dilts' employer. The Plaintiffs received workers' compensation benefits from Dilts' employer UGS, Inc. Thus, as the Court has ruled, the Plaintiffs cannot pursue a negligence claim against UGS, Inc.

Maxim argues that it "receives the immunity granted to decedents' employer UGS, Inc. through the operation of the 'loaned servant doctrine'." (Rec. No. 116, Motion at 4). UGS, Inc., however, is immune from tort liability under the exclusivity provision because it was the employer of Dilts, the deceased employee. Maxim, however, has never argued that it should or could be deemed Dilts' statutory employer. Thus, the exclusivity provision cannot shield Maxim from the Plaintiffs' negligence claim.

### B.     The Loaned Service Doctrine.

The "loaned servant doctrine," however, does fit Maxim's argument that the Plaintiffs' claim against it should be dismissed. That doctrine may relieve an employer of liability for injuries *caused* by its employee. An employer such as Maxim charged with respondeat superior liability raises it as a defense, asserting that, at the time of the incident, the allegedly *injuring* employee was working as a "loaned servant" to another employer.

Again, there is no dispute that the crane operator Gunn was Maxim's regular employee.

5

Maxim, however, argues that, at the time of the accident, Gunn was working as UGS, Inc.'s loaned servant and, thus, UGS, Inc. should be liable for Gunn's actions.

Under the loaned servant doctrine, the "general rule is a  servant may be loaned or hired by his master for some special purpose so as to become, as to that service, the servant of the person to whom he is loaned or hired, and to impose on the latter the usual liabilities of a master, the general or original master being correspondingly relieved." *Carnes v. Dept. of Economic Sec.*, 435 S.W.2d 758, 761 (Ky. 1968)(quotations and citation omitted).

For example, in *Belew v. Lafayette Steel Erector, Inc.*, 19 F.3d 18 (6th Cir. 1994)(unpublished), a case that applies Tennessee law but which Maxim relies on in its motion, the plaintiff worked for E.G. Smith Construction Co.  He was injured on the job when a forklift ran over him. The driver of the forklift was Billy Choate and he was employed by the defendant Lafayette Steel Erector, Inc.  The injured plaintiff sued Lafayette Steel on a theory of respondeat superior, charging that Lafayette Steel was responsible for Choate's acts. *Id*. at *2.  The court concluded that, at the time of the accident, Choate was a "loaned servant" of the injured plaintiff's employer E.G. Smith, thus relieving Lafayette of liability for any negligence by Choate. *Id*.

 Accordingly, only the plaintiff's employer  E.G. Smith could be liable for Choate's actions. The relevance of the workers' compensation statutes was that, pursuant to the Tennessee exclusivity provision, the plaintiff's remedy against his own employer for Choate's acts was limited to workers' compensation benefits.  *Id.* at *3.

In this case, Maxim argues that it is relieved of all liability for Gunn's actions because, at the time of those actions, Gunn was working for UGS, Inc.  If this is true, then only UGS, Inc. can be liable for Gunn's actions.  The relevance of the Kentucky exclusivity provision is that it limits the

Plaintiffs' remedy against *UGS, Inc*. to the death benefits that UGS, Inc.'s workers' compensation carrier has already paid them.

### C.   The Exclusivity Provision is Irrelevant to Maxim's Defense.

Thus, the exclusivity provision is irrelevant to Maxim's defense.  It is only relevant in a claim against UGS, Inc.

Maxim attempts to use the loaned servant doctrine and the exclusivity provision in the same manner that the defendant did in *Allied Machinery, Inc. v. Wilson*, 673 S.W.2d 728, 731 (Ky. App. 1984).  However, in *Allied*, the Court held that the plaintiff injured employee was a loaned servant of the defendant employer (Allied)  who also employed the injuring employee (Allen).  Thus, the injured plaintiff was barred under the exclusivity provision from filing a tort action against either his "special" employer at the time of the accident (Allied) or his co-employee (Allen).

But Maxim does not argue that Dilts was *its* loaned servant at the time of the incident, thereby barring the Plaintiffs from bring any tort claims against it as the employer. Instead, Maxim argues that Gunn was the loaned servant of UGS, Inc.  If this is true, then, as in *Allied*, the exclusivity provision prohibits the Plaintiffs from bringing an action against Gunn, as Dilts' co-employee. But the holding in *Allied* does not prevent the Plaintiffs from bringing an action against Maxim.

Maxim also argues that, if the Plaintiffs' claim against Gunn are barred under the exclusivity provision because Gunn and Dilts should be viewed as co-employees of UGS, Inc., then the claims against Maxim are also barred because its liability depends upon Gunn's liability.  Maxim argues "[a] principal cannot be found to be liable where its agent. . . has been discharged from liability. (Rec. No. 170, Reply at 13; Rec. No. 116, Motion at 18).  For this proposition, Maxim cites *Zetter*

7

*v. Griffith Aviation, Inc.*, 435 F.Supp.2d 622 (6th Cir. 2006); *Copeland v. Humana of Kentucky, Inc.*, 769 S.W.2d 67 (Ky. App. 1989); and *Waddle v. Galen*, 131 S.W.3d 361 (Ky. App. 2004).  In all of these cases the plaintiffs had "released" the agent from liability and the courts acknowledged that "a release of an agent from liability also releases the principal insofar as the principal's liability is derived solely from the agent's negligence." *See, e.g., Waddle*, 131 S.W.3d at 625.

In this case, the plaintiffs have not "released" Gunn from liability.  Instead, Maxim argues that Gunn is *immune* from suit as a co-employee of Dilts under the exclusivity provision.  In general, "in an action against a principal based on the conduct of a servant in the course of employment. . . [t]he principal has no defense because of the fact that. . . the agent had an immunity from civil liability as to the act."  Restatement (Second)Agency § 217; *See also Cohen v. Alliant Enterprises, Inc.*, 60 S.W.3rd 536, 538-39 (Ky. 2001)(distinguishing *Copeland* because it involved a "release" of the agent and stating that it does not preclude recovery from the principal anytime the agent is beyond reach because it is "the negligence of the servant that is imputed to the master not the liability").  Maxim has cited no cases supporting its argument that if Gunn is immune from tort liability under the exclusivity provision, Maxim is also immune.

Though this case arises in the workers' compensation context in that Dilts' employer was protected under the exclusivity provision, Maxim's defense is not found in the exclusivity provision. The Court will now turn to Maxim's loaned servant argument.

> **D.** **Factors in Determining whether Gunn was, as a matter of law, a Loaned Servant to UGS, Inc.**

Again, there is no dispute that Gunn was Maxim's regular employee.  Determining whether Maxim should nonetheless be relieved of any liability for Gunn's actions on the basis that he was

a loaned servant to UGS, Inc. is a fact-intensive inquiry and, thus, often a jury question.

"Whether the relation of master and servant exists in a particular case must depend on its surrounding facts and circumstances, including the contract between the parties, and no one feature of the relation between them is determinative, but all must be considered together." *Carnes v. Dept. of Economic Sec.*, 435 S.W.2d 758, 761 (Ky. 1968)(citation omitted). "Ordinarily the question is one of fact." *Bowen v. Gradison Const.* Co., 32 S.W.2d 1014, 1019 (Ky. 1930); *Asher v. Unarco Material Handling*, 2008 WL 2397710, at * 2, 3 (E.D. Ky. 2008). *See also Reffitt v Hajjar*, 892 S.W.2d 599, 604 (Ky. 1995); *Brown v. Tennessee Gas Pipeline Co.*, 623 F.2d 450, 454 (6th Cir. 1980).

Like any fact issue on summary judgment, however, the Court may be able to decide it as a matter of law if reasonable minds could only come to one conclusion. *Anderson*, 477 U.S. at 250-51.

The next issue then is what factors the Court should consider in determining whether, as a matter of law, Gunn was working as UGS, Inc.'s loaned servant at the time of the accident. Maxim begins its motion by citing *Morlan v. Green River*, 35 F.3d 566 (6th Cir. 1994). That case demonstrates how a defendant may use a combination of the exclusivity provision and the loaned servant doctrine to shield it from tort liability.

There, the injured employee sued the defendant company for negligence. The defendant argued that, although the injured employee was not its regular employee, he was its loaned servant at the time of the accident and, thus, the injured employee was barred under the exclusivity provision from asserting a claim against it. *Id*. at *5

Under the test set forth in *Morlan*, an employee is a loaned servant of an employer (the

9

"special employer") if:

1)      the work being done is essentially that of the special employer;

2)      the special employer has the right to control the details of the work; and

3)      the employee has made a contract of hire, express or implied with the special employer.

*Id*. at *5 (citing *Smith Concrete, Inc. v. Mountain Enterprises, Inc.*, 833 S.W.2d 808, 812 (Ky. 1992)).

*Morlan*, however, applied these factors to determine the injured employee's employer for purposes of the exclusivity provision. The issue in this case is who was the injuring employee's employer for purposes of determining who is liable for the injuring employee's act.

That issue was addressed by the Kentucky Supreme Court in *Ambrosius Industries, Inc. v. Adams*, 293 S.W.2d 230 (Ky. 1956). There, the plaintiff employee was injured while assembling a concrete mixing plant. *Id*. at 232. The plaintiff worked for a company called C. Watson Company. That company sold defendant Holloway Ready Mix Company the concrete mixing plant and sent the plaintiff to Holloway to help with its assembly. *Id.*

Similar to this case, Holloway rented a crane from a company called Ambrosius Industries, Inc. to lift various parts of the plant into position. *Id*. Along with the crane, Holloway rented a crane operator and an assistant called an "oiler." *Id*. The plaintiff employee of C. Watson was injured when a choker cable used in the crane-lifting operation broke. *Id*. He sued Holloway and Ambrosius.

Ambrosius, like Maxim, argued that the crane operator and oiler were loaned servants of co-defendant Holloway. In resolving that issue, the court adopted the test from the Restatement of the

10

law of Agency used in determining whether an employee is an independent contractor or employee, saying the following factors should be considered:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) The kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer; and

(i) whether or not the parties believe they are creating the relationship of master and servant.

*Id*. at 236 (quoting Restatement (Second) Agency § 220(2)).

After reviewing the case law regarding the loaned servant doctrine, however, it does not appear that these tests would lead to contrary conclusions. In fact, all factors of both tests appear to be aimed at making one central determination: whether the borrowing employer had the right to control the loaned employee.

"[I]n determining whether one is an agent or servant or an independent contractor, substance prevails over form, and . . . the main dispositive criterion is whether it is understood that the alleged principal or master has the right to control the details of the work." *United Engineers &*

11

*Constructors, Inc. v. Branham*, 550 S.W.2d 540, 543 (Ky. 1977). "An examination of the foregoing authorities confirms the proposition that a servant may be loaned or hired by his master for some special purpose so as to become the servant of the party to whom he is loaned or hired for that particular service. Moreover, those cases confirm the principle that the basic test is who controls the servant in the particular employment." *Smith v. Gennet*, 385 S.W.2d 957, 958 (Ky. 1965). "While earlier cases attempted to narrow the scope of employer immunity by focusing on the contract relationship between the employee and the employer whose work was being done at that time. . . more recent cases have effectively broadened its scope by focusing on who had the right to control the details of the work at the time of the injury." *Allied Machinery*, 673 S.W.2d at 731. *See also* Restatement (Third) Agency § 7.07(3)(a)("an employee is an agent whose principal controls or has the right to control the manner and means of the agent's performance of work."); *O'Bryan v. Holy See*, 556 F.3d 361, 382 (6th Cir. 2009)(citing *Papa John's Int'l, Inc. v. McCoy*, 244 S.W.3d 44, 51-52 (Ky. 2008) for the proposition that Kentucky has adopted the Restatement (Third) of Agency § 7.07 definition of employee when addressing claims of vicarious liability).

In *Morlan*, the court explained that, in determining whether an employee is a loaned servant, "courts look to determine whether the corporation exercised control as to the means, or as to the mode, manner and details of the performance of the work." *Morlan*, 35 F.3d at *5.

Maxim argues that Gunn was under UGS, Inc.'s control at the time of the incident for three primary reasons: 1) at the time of the accident, Gunn was engaged in UGS, Inc.'s work of constructing the doghouse; 2) UGS, Inc. employees told Gunn what materials to lift with the crane and where to lift them and, on the lift at issue, Dilts directed Gunn via radio; and 3) the contract between Maxim and UGS, Inc. provided that the equipment leased to Maxim and all Maxim

personnel operating the equipment were under UGS, Inc.'s "exclusive jurisdiction, possession, supervision, and control" and that UGS Inc. was obligated to provide personnel to "supervise and direct the operation of the Equipment." The Court will discuss each of these factors below.

**1)   Gunn was Engaged in UGS, Inc.'s Work of Constructing a Doghouse.**

Maxim argues that Gunn was engaged in UGS, Inc.'s work at the time of the accident because his primary job on the NAS site was to set panels for the doghouse and construction of the doghouse was UGS, Inc.'s work, not Maxim's. In response, the Plaintiffs argue that the "work" that Gunn was doing should not be defined as building a doghouse. Instead, the work should be defined as operating a crane. If this is how the "work" is defined, then Gunn was engaged in Maxim's work and not that of UGS, Inc.

**2)   UGS, Inc. Employees told Gunn what Materials to Lift with the Crane and where to Lift Them.**

Maxim argues that UGS, Inc. employees told Gunn each day what needed to be lifted and where it needed to be lifted. Scott McMahan was the UGS foreman. (Rec. No. 166, Response, Ex. H, McMahan Dep., p. 113). Another UGS, Inc. employee on the site was Tim Willman. (Rec. No. 166, Response, Ex. L, Willman Dep., p. 23). McMahan testified that, on some mornings, McMahan or Willman and Gunn would discuss the work to be done for that day. (Rec. No. 166, Response, Ex. H, McMahan Dep., pp. 113-14). Gunn testified that, generally, a foreman or person in charge of the crew would approach him when he reported to the site and start giving him a layout of what to expect that day. (Rec. No. 166, Ex. A, Gunn Dep., pp. 22-23).

Maxim also argues that the UGS, Inc. employees that did the rigging on a lift, communicated to Gunn by hand signals or radio during the lifts. McMahan testified that the only interaction UGS,

13

Inc. employees had with Gunn's crane was to give him direction as to whether he needed to "cable up," "cable down," "swing here," or "swing there."  These directions were given by hand signals when the lift was in Gunn's vision.  (Rec. No. 166, Response, Ex. H, McMahan Dep., p. 140).  On the day of the accident, however, Dilts gave these signals by radio because Gunn was working "in the blind,"meaning Dilts and the lift were out of Gunn's vision. (Rec. No. 166, Ex. H, McMahan Dep., p. 140).

Maxim also cites Gunn's testimony that "when the crane is rented or leased to another company, technically I'm working for them, and whenever they need the use of the crane I'm the one that does it." (Rec. No. 166, Response, Ex. A, Gunn Dep., p. 17).[2]

In response, the Plaintiffs argue that Maxim controlled the details of Gunn's work.  They argue that Maxim is in the business of leasing cranes and crane operators and that it selects which crane and which operator will make each lift that Maxim is hired to do.  The Plaintiffs also point out that Gunn's boss was Keith Phelps, the dispatcher for the Louisville branch of Maxim and that Gunn had daily contact with Phelps.  The Plaintiffs argue that it was Phelps who directed Gunn to any of various job sites.  The Plaintiffs state that Maxim had the exclusive authority to reassign Gunn from the NAS site and to ultimately terminate his employment.

In its Rule 26 disclosures, Maxim stated that Gunn was its employee and that Phelps "was the supervisor of the site during the construction of the 'dog house' and was the person from whom Maxim's operator, Travis Gunn, took direction.  Mr. Phelps also directed the work for the United Group Services Employees, including Plaintiffs' decedents."  (Rec. No. 166, Response, Ex. N,

---

[2]  Maxim did not file any depositions with its motion for summary judgment.  The Plaintiffs filed the portions of the depositions cited in their pleadings.

Maxim Disclosures).

The Plaintiffs also point out that Maxim's safety manager, Kale Kelly, made site inspections to evaluate the safety of the site and to ensure that Maxim employees were following Maxim protocol and complying with OSA, ANSI and AMSI standards.

The Plaintiffs also argue that the Maxim crane operator was in charge of setting up the crane for each lift and that the crane operator was charged with the maintenance and operation of the crane. The Plaintiffs argue that UGS, Inc. had no employees with the knowledge or training to operate the crane.  Maxim, on the other hand, had put Gunn through 6,000 hours of training and several years of apprenticeship.

The Plaintiffs point out that Maxim  paid Gunn, including his health benefits, retirement and union dues and that UGS, Inc. did not pay Gunn. The Plaintiffs further point out that, in order to be paid, Maxim required Gunn to complete and turn in a daily time sheet on which he tracked his time at the NAS site.

### 3) Maxim's Contract with UGS, Inc. Provided that Gunn was under UGS, Inc.'s Exclusive Supervision and Control.

Maxim leased the crane to UGS, Inc. pursuant to a serious of daily "Short Term Rental Agreements." (Rec. No. 166, Response, Ex. M).  The first such agreement in the record is dated July 21, 2006 and the last is dated July 28, 2006.  Each of these agreements designates Gunn as the crane operator.  The "job description" contained in the agreement states, "set steel."  The agreement states that Maxim leases the equipment and "shall arrange for operational personnel of Equipment."

In support of its argument that Gunn was UGS, Inc.'s loaned servant, Maxim points to the provisions of the agreement stating that "the Equipment and all persons operating or maintaining

15

such Equipment, including [Maxim's] employees, agents or independent contractors, are under [UGS, Inc.'s] exclusive jurisdiction, possession, supervision, and control. [UGS, Inc.] shall provide competent and experienced personnel to supervise and direct the operation of the Equipment."

The Plaintiffs recognize the provisions of the short term rental agreement regarding control but argue that, in *United Engineers and Constructors, Inc. v. Branham*, 550 S.W. 2d 540 (Ky. 1977), the Kentucky Supreme Court indicated that employment status "cannot be made to stand or fall on the basis of paperwork." 550 S.W.2d at 543.

### E.   The Loaned Servant Doctrine in Kentucky Crane Cases.

### 1)   *United Engineers and Constructors, Inc. v. Branham*, 550 S.W.2d 540 (Ky. 1977).

In *United Engineers and Constructors, Inc. v. Branham*, 550 S.W.2d 540 (Ky. 1977), the injured employee was a crane oiler for a company called E.B. Lowman which was a contractor that leased cranes and other heavy equipment to others. *Id*. at 542. E.B. Lowman leased a crane to a company called United for use on a construction project. *Id*. at 541. Along with the crane, E.B. Lowman leased a crane operator and the plaintiff oiler to United. *Id.*. at 543.

The accident occurred after the crane crew had completed the job for which it had been hired and the United foreman instructed the crew to take the crane to a parking area. *Id*. at 544. In order to move the crane, however, its gantry, a four-legged structure on top of the crane cab, had to be lowered so that it could pass through doors. *Id*. The court noted, "[a]ll of the witnesses agree, however, that the oiler cannot [lower the gantry] without help, and it is customary for the crane crew to look to the job superintendent to provide it. In this instance [the United foreman] assigned two of his laborers to give the crane crew whatever assistance it needed." *Id*.

The plaintiff oiler was injured in the process of lowering the gantry. *Id*. at 545. He sued

16

United, asserting that his injures were caused by the negligence of United's employees who assisted with lowering the gantry. *Id*. at 541. United asserted that the oiler was its "loaned servant." *Id*. at 542. Thus, United was immune from a negligence suit under the exclusivity provision. *Id*. at 546.

In determining whether the oiler was working for Lowman or United at the time, the court noted the oiler's testimony "that he and the operator had complete charge of the crane" and that United's foreman, "had charge of where to take their dirt and where to place it' but had no control over the crane." *Id*. at 545. The court noted that there was no evidence that the United foreman was present when the gantry was lowered. *Id*. at 546. The court further noted that there was no evidence the foreman gave any instructions as to how the gantry was to be lowered and that, in fact, the foreman did not have enough knowledge to give such instructions. *Id*.

The court concluded that :

> Any way it is viewed, clearly United had no responsibility for and no authority over the mechanical operation of the crane. Its prerogative was only to tell the operator when and where to dig and take the dirt.

*Id*. at 546.

The court continued, "[t]he procedure of lowering the gantry was peculiarly within the province and expertise of the crew. In that particular operation we agree that Branham and [the crane operator] were not loaned servants of United." *Id*. at 547.

### 2)     *Fisher Equipment Co. v. West,* **365 S.W.2d 319 (Ky. 1963).**

In *Fisher Equipment Co. v. West*, 365 S.W.2d 319 (Ky. 1963), the defendant Fisher Equipment was in the business of renting construction equipment and leased a crane with an operator and oiler to a company called Klug Construction Co. An employee named West was employed by Klug. He was electrocuted when the crane operator was positioning the crane to move some pipes

17

under some high tension wires and his widow sued Fisher charging it with respondeat superior liability for the actions of its crane operator.  *Id*. at 320-21.

In defense, Fisher argued that the crane operator was Klug's loaned servant and, thus, Fisher should be relieved of liability.  *Id*. at 321.  The court held that the crane operator was not Klug's loaned servant but instead remained Fisher's servant.  *Id*. at 322.

In making that determination, the court noted that Fisher was in the business of renting cranes and furnishing persons to operate them.  *Id*. at 321-22.   The court noted that the crane's "proper operation required skill and experience which none of Klug's employees possessed." *Id*. at 322.  The court noted that Fisher paid the crane operator, not Klug. *Id*.

In response to Fisher's argument that, because Klug was in charge of construction work in the site, Klug had the right to control the details of the work, the court stated:

> Much stress is laid upon the fact that the crane operator had followed certain verbal instructions and hand signals given to him by Klug's foreman with respect to the movement of the crane. The obedience to these co-called instructions showed cooperation rather than subordination since the crane operator stated in effect that he would obey only such of these instructions as he thought could be executed without harm to appellant's crane.

*Id*.

As to the discharge authority, the court stated, "it is significant that, even though Klug could request [Fischer] to remove the crane operator from the job site, only [Fisher] had the authority to discharge him from his position as crane operator."  *Id*.

**3)**    ***Kern v. Chicago Bridge & Iron Co*., 115 F.Supp. 85 (W.D. Ky. 1953).***

In *Kern v. Chicago Bridge & Iron Co.*, 115 F.Supp. 85 (W.D. Ky. 1953), the Chicago Bridge and Iron Company entered into a contract with Louisville Refining Company for certain construction projects at  the refining company's plant.  *Id*. at 86.  Louisville Refining also entered into a contract

18

with the Petroleum Piping Company for certain other construction at the plant.   *Id*.

Chicago Bridge owned a derrick crane and furnished Petroleum Piping with the derrick crane and an operator *Id*. Two employees were injured when they were being lifted in the bucket of the derrick and the bucket suddenly dropped.  *Id*. at 87.  They sued Chicago Bridge and a jury ruled in the plaintiff's favor.  *Id*. Chicago Bridge then moved for a directed verdict, arguing that it was not liable because its derrick operator was working as a loaned servant for Petroleum Piping at the time of the accident.  *Id*. at 86, 87.  The court explained:

> A servant may be loaned or hired by his master for some special purpose so as to become, as to that service, the servant of the party to whom he is loaned or hired, and this is true even though the servant is selected, paid, and may be discharged by the original employer. . .The test turns on who controls the servant in the named employment.

*Id*. at 87.

In denying Chicago Bridge's motion, the court noted that the derrick operator was obeying the signals of Petroleum Piping Company but the Court held that "the giving of the signals was not the 'giving of orders but of information,' and that obedience to the signals showed cooperation rather than subordination."  *Id*. at 89 (citing *Standard Oil v. Anderson*, 212 U.S. 215 (1909)).

The court also noted:

> The operator of cranes and derricks of the kind involved in this case requires technical skill on the part of the operator, and it is inconceivable that any employee of Petroleum Piping Company was authorized to or capable of directing [the derrick operator] in the operation of the crane when nobody connected with Petroleum Piping is shown to have understood the operation of the crane or to have possessed the technical knowledge and skill necessary for its operation.

*Id*. at 93.

19

4)      *Ambrosius Industries, Inc. v. Adams*, **293 S.W.2d 230 (Ky. 1956)**.

The court has already explained the relevant facts of *Ambrosius Industries, Inc. v. Adams,* 293 S.W.2d 230 (Ky. 1956).  In that case, the issue was whether the crane operator and oiler leased by Ambrosius to Holloway were loaned servants of Holloway at the time of the incident at issue or whether they remained Ambrosius's servants.  *Id*. at 232.

In addressing that, the court noted that the owner of Ambrosius testified that he did not know how the crane would be used and that the crane was being rented by the hour.  *Id*. at 235.  The court also noted that the Holloway owner told the crane crew when they arrived at the job site the work to be done that day.  *Id*.

As explained, the court analyzed the issue under the factors from the Restatement Second of Agency that are considered when determining whether a worker is an independent contractor or an employee.  *Id*. at 236.  The court determined that particular emphasis should be given to "the skill required in the particular occupation," noting that "the use of the crane required a highly skilled operator."  *Id.*  The court also found significant the fact that Ambrosius "was engaged in a distinct occupation or business" and that "the work to be done was not a part of the regular business" of Holloway.  *Id*  The court also noted that at least a portion of Ambrosius's business consisted of renting equipment and recited the following from the Restatement of the Law of Agency:

> A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his interests in the use of the instrumentality and these may be divergent from the interests of the temporary employer. If the servant is expected only to give results called for by the temporary employer and to use the instrumentality as the servant would expect his general employer would desire, the original service continues. Upon this question, the fact that the general employer is in the business of renting machines and man is relevant,

20

since in such case there is more likely to be an intent to retain control over the instrumentality. A person who is not in such business and who, gratuitously or not, as a matter not within his general business enterprise permits his servant and instrumentality to assist another, is more apt to intend to surrender control.

*Id*.

The court distinguished cases where the equipment lessee were "experienced in directing the use of the kind of machinery involved;" where the rented equipment was "ordinary motor trucks, which did not require special skill in operation and were not of exceptional value;" and where operation of the rented equipment was an essential feature of the lessee's regular business. *Id*. at 236-37.

The court noted that Ambrosius's argument that its crane crew were the loaned servants of Holloway was "predicated almost entirely on the assumption that because the Holloway Company was in general charge of the erection of the cement mixing plant, that company had the right of control over all *details* of the work." *Id*. at 237. The court found "a jury question as to whether the parties contemplated that the Holloway Company would have any right to control the details of the work of the crane. A fair conclusion from the evidence would be that the Holloway Company had no right to control the manner of operating the crane, or the mechanical assembling of the plant, but had control only as to coordinating these separate activities to achieve the ultimate result desired." *Id*. "[T]he fact that the Holloway Company had general control over the overall job does not mean that it had the right to control the details of the crane operation." *Id*.

### E.    The Court Cannot Find as a Matter of Law that Gunn was the Loaned Servant of UGS, Inc.

Given this case law, the Court cannot find as a matter of law that Gunn was the loaned servant of UGS, Inc.  As to Maxim's argument that Gunn was engaged in UGS, Inc.'s work at the

time of the accident, the above-summarized cases indicate that the Court should view the work that Gunn was engaged in as operating a crane.  The Court must also consider that Maxim was regularly employed in the business of renting cranes and furnishing persons to operate them; that operating a crane was peculiarly within the province and expertise of Gunn; that  there has been no showing that any UGS, Inc. personnel had knowledge, skill or experience in operating cranes; and that the operation of cranes was not part of the regular business of UGS, Inc.

According to the case law, also relevant is that Gunn was Maxim's regular employee at the time of the accident, that Maxim paid Gunn, and that only Maxim had the power to fire him from his position as crane operator.

As to the relevance of the hand signals or radio directions that UGS, Inc. employees gave to Gunn, these cases instruct that such directions do not establish control over Gunn.  Nor is control determined by the fact that the UGS, Inc. foreman told Gunn the work to be done each day at the job site or told Gunn what to lift and where to lift it.

Finally, as to the relevance of the contract between the parties, the *Ambrosius* and *United Engineers* cases indicate this is just one factor to consider in analyzing the loaned servant question but is not by itself determinative.  As stated above, in *Allied Machinery*, the court specifically noted that, "[w]hile earlier cases attempted to narrow the scope of employer immunity by focusing on the contract relationship between the employee and the employer whose work was being done at that time. . . more recent cases have effectively broadened its scope by focusing on who had the right to control the details of the work at the time of the injury."  673 S.W.2d at 731.

Accordingly, there is at least a jury question as to whether UGS, Inc. controlled the details of the crane work and, thus, whether Gunn was UGS, Inc.'s loaned servant at the time of the

22

accident.

**IV.   CONCLUSION.**

For all these reasons, the Court hereby ORDERS that:

1)      Maxim's Motion for Summary Judgment (Rec. No. 116) is DENIED;

2)      Tinna Dilts' Motion for Leave to File Surreply  (Rec. No. 172) is GRANTED and and the Clerk of the Court is DIRECTED to file the tendered Surreply in the record; and

3)      Maxim's Motion for Leave to File a 19-Page Reply (Rec. No. 173) is GRANTED.

Dated this 25th day of March, 2009.

**Signed By:**

**_Karen K. Caldwell_**

**United States District Judge**