UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at FRANKFORT

CIVIL ACTION NO. 07-38

TINA DILTS, as Ancillary Administratrix and
Personal Representative of the Estate of Rickie Dilts, et al.,                              PLAINTIFF

v.                            **OPINION AND ORDER**

UNITED GROUP SERVICES, LLC., et al.,                                   DEFENDANTS

\* \* \* \* \* \* \* \* \*

This matter is before the Court on the Motion for Summary Judgment filed by Defendant North American Stainless ("NAS") (DE 231). For the following reasons, the Court will GRANT the motion.

**I.**        **BACKGROUND.**

In their Complaint, the Plaintiffs assert that Rickie Dilts and Matthew Collins were employed by the Defendant UGS, Inc. On or about July 28, 2006, Dilts and Collins were assigned to work at Defendant NAS's plant in Carroll County, Kentucky. At the NAS plant, Dilts and Collins were working approximately 80 feet from the ground on the assembly of the roof of a structure referred to as the "doghouse."

The doghouse is a large steel structure built inside the factory at NAS that houses an electric arc furnace used to melt stainless steel. According to NAS, the purpose of the doghouse is to capture the fumes and exhaust produced during the melting of stainless steel in the electric arc furnace. (DE 231, Mot. at 3). The doghouse is made of separate metal panels weighing between 1,000 and 6,000 pounds. (R. 166, Response, Ex. A, Gunn Dep. at 45; Ex. C, Corrales Dep. at 16). Dilts and Collins were re-setting the roof panel. The panel was lifted into place on the doghouse by a crane. Dilts and Collins were on the roof panel when it fell, causing them to fall 80 feet to the concrete floor. Dilts and Collins died as a result of the fall.

According to NAS, both Dilts and Collins were wearing safety harnesses and lanyards but they were not physically secured to any structure. Thus, they fell with the panel. (DE 231, Mot. at 4).

The original Plaintiffs in this matter included Sandi Neace, Collins' mother, as the administrator of his estate. However, pursuant to an Agreed Order (Rec. No. 148), Neace's claims were dismissed. The remaining Plaintiffs in this action are Tinna Dilts, who was Rickie Dilts's wife, and Rickie Dilts, Jr. Tinna Dilts pursues claims individually, as administrator of Dilts's estate, and

as next friend of Dilts's minor children. The Plaintiffs named five defendants: UGS, Inc.; NAS; UGS, LLC; Siemens Energy & Automation, Inc.; and Maxim Crane Works, L.P.

As stated, the Plaintiffs alleged in their Complaint that UGS, Inc. was Dilts's employer. (Rec. No. 1, Complaint ¶ 2). NAS owned the factory where the incident occurred. NAS entered into a contract with Siemens[1] requiring it to install the electric arc furnace and associated fume exhaust system. (DE 231, Ex. A, Contract, Art. 1.1, 1.2). Siemens then subcontracted with UGS, Inc. which, in turn, subcontracted with Maxim. There is no dispute that the roof panel that fell was lifted and put into place by a crane owned by Maxim. The crane operator was Maxim employee Travis Gunn (Rec. No. 116, Maxim Mot. For Summ. J. at 1).

A Kentucky OSHA compliance officer, Carla Cornett, investigated the accident site. In her report, she recommended that no citations be issued to Siemens, Maxim or NAS. She did, however, recommend that certain citations be issued to UGS, Inc. and those citations were issued.

As to NAS, after speaking with unidentified employees and employers on the site, Cornett found that:

> It was the general opinion that NAS and [Siemens] did not have enough enforcement presence and involvement in safety during this project. . . Very few, if any, safety meetings were held by NAS or [Siemens] with the subcontractors. . . [NAS] safety staff did conduct inspections in the area and looked for hazards or violations. [NAS Safety Coordinator Joanna Curry] stated that she did not observe violations by UGS employees of fall protection rules while on her walk-through of the construction site. . . She also said that during her inspections she could not see the employees from her vantage point while they

---

[1] The party named in the contract was Voest-Alpine Industries, Inc. However, Voest-Alpine Industries, Inc. was later acquired by Siemens. Thus, Siemens is the Defendant in this action.

> worked on the roof of the doghouse. [NAS Senior Safety Engineer Mike Tolin] also stated that he could not see the employees as they worked on the roof of the doghouse.

(DE 283, Cornett Dep., Ex. N at 10-11).

Cornett concluded that there was not evidence that NAS should have known that Dilts and Collins were not connected to an anchor.

The Plaintiffs asserted a negligence claim against all of the Defendants. However, by Opinion and Order dated September 22, 2008 (Rec. No. 137), this Court dismissed the Plaintiffs' negligence claims against UGS, Inc., the employer of Dilts, finding that the Plaintiffs received workers' compensation death benefits from UGS, Inc.'s insurance carrier and, thus, they were barred from bringing any tort claim against UGS, Inc. under the exclusivity provision of the Kentucky Workers' Compensation Act, KRS 342.0011, *et seq*.

The Complaint asserts both negligence and negligence per se claims against NAS. NAS now moves for summary judgment in its favor on both claims.

## II.    STANDARD.

Under Fed. R. Civ. P. 56, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

3

In considering a motion for summary judgment, the court must view the facts and draw all inferences therefrom in a light most favorable to the nonmoving party. *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The moving party must show conclusively that there is no genuine issue of material fact. *Id*. However, at the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter. *Wiley v. United States*, 20 F.3d 222, 226 (6 th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249(1986)).

The Court is not to judge the evidence or make findings of fact. *60 Ivy Street Corp*., 822 F.2d at 1435-36. Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**III.     ANALYSIS.**

**A.     Negligence Per Se Claim against NAS for OSHA Violations.**

Under Kentucky law, violation of state and federal occupational safety and health statutes ("KOSHA" and "OSHA," respectively) can constitute negligence per se if the plaintiff is within the class of person the statute is intended to protect. *Hargis v. Baize*, 168 S.W.3d 36, 45 (Ky. 2005). In *Hargis*, the court determined that KRS 446.070, which authorizes a private right of action for violations of Kentucky statutes, "converts the standard of care required by the violated statute into a statutory standard of care for the negligence claim, the violation of which is negligence per se." *Id*.

In support of its argument that it cannot be held negligent per se for UGS, Inc's KOSHA and OSHA violations, NAS relies on *Pennington v. MeadWestvaco Corp.*, 238 S.W.3d 667 (Ky. App. 2007). In that case, the defendant MeadWestvaco, like NAS, owned the work site where the plaintiff was injured. *Id*. at 668. MeadWestvaco was renovating its physical plant and a company called Jenkins-Essex Construction Co. was the renovation contractor. *Id*. Jenkins-Essex entered into a subcontract with Mead Paining, which was the employer of the plaintiff. *Id*. at 670.

4

The plaintiff was injured while working at MeadWestvaco's site and asserted a negligence claim against it. The court noted that the plaintiff's negligence claim was based on MeadWestvaco's alleged failure to comply with certain KOSHA regulations. *Id.* at 670. The court determined that the property owner MeadWestvaco could not be considered an "employer" for purposes of the KOSHA regulations.

In support of this conclusion, the court noted the following: 1) MeadWestvaco had purchased the plant where the accident occurred to accommodate its anticipated manufacturing needs, but there was no evidence that, at the time of the accident, it was a "regular job site" for MeadWestvaco; 2) MeadWestvaco had ultimate control of the premises because it owned it but it did not "retain sufficient control of the subcontractor's employees or the painting of the facility" to be regarded as an employer responsible for violations of KOSHA; and 3) the contract conferred upon the subcontractor Jenkins-Essex both the opportunity and responsibility to assure compliance with safety regulations. *Id.* at 672.

In reaching its conclusion, the *MeadWestvaco* court discussed *Teal v. E.I. DuPont de Nemours and Co.*, 728 F.2d 799 (6th Cir. 1984). That case was governed by Tennessee law which, like Kentucky law, holds that a breach of a federal or state safety regulation or statute is negligence per se "if the party injured is a member of the class of persons the statute or regulation was intended to protect." *Id.* at 802.

In *Teal*, the plaintiff was injured at a plant owned by the Defendant DuPont. *Id.* at 800. DuPont contracted with Daniel Construction to remove hydraulic bailers from DuPont's plant. *Id.* The plaintiff worked for Daniel Construction and was injured when he fell from a ladder that was permanently affixed to the DuPont plant. *Id.* at 801. There was no dispute that DuPont's ladder violated a specific OSHA regulation. *Id.* at 801, 803.

Thus, the issue in that case was "whether an employee of an independent contractor is a member of the class of persons that the OSHA regulation was intended to protect." *Id.* at 803. The Court concluded that the specific OSHA provision at issue should be "logically construed as imposing an obligation on the part of employers to protect *all* of the employees who work at a particular job site." *Id.* at 804.

5

Thus, "employees of an independent contractor who work on the premises of another employer must be considered members of the class that [the specific OSHA provision] was intended to protect." *Id*. The Court continued, "once an employer is deemed responsible for complying with OSHA regulations, it is obligated to protect every employee who works at its workplace." *Id*. at 805.    The Kentucky Supreme Court later adopted this reasoning in *Hargis*. In that case, Hargis was an independent contract hired by the defendant Baize to haul lumber to and from a lumber yard and saw mill owned by Baize. 168 S.W.3d at 39. Hargis was killed at Baize's lumber yard when a large log rolled off the trailer and struck him. *Id*. His widow asserted a negligence per se claim against Baize, arguing that the death was caused by Baize's failure to comply with a specific KOSHA regulation regarding the manner by which binders on logs should be released prior to unloading. *Id*. at 39-40.

Like *Teal*, the issue in that case was whether KOSHA's protections extended to workers on the job site other than direct employees of the owner. Adopting *Teal,* the concluded that "KOSHA's protections extend to any employee, including an employee of an independent contractor, who is performing work at another employer's workplace." *Id*. at 43.

In *Hargis*, the court specifically distinguished the situation before it from that presented in *Ellis v. Chase Communications, Inc.*, 63 F.3d 473 (6th Cir. 1995). In that case, the defendant owned a communications tower. *Id*. at 475. It entered into a contract with Nationwide Tower Company to clean and paint the tower. *Id*. Nationwide then entered into a subcontract with Charles Raines. *Id.* The subcontract provided that Raines would furnish all materials, labor and supervision and that all work would by performed in accordance with OSHA rules and regulations. *Id*.

Jere Martin Ellis was an employee of the subcontractor Raines. *Id.* He fell to his death while painting the tower. *Id.* His widow asserted a claim against Chase, the tower owner. In support of her claim she cited *Teal*. The Sixth Circuit explained that "*Teal* does not impose an unlimited duty on an employer to protect anyone who happens upon any portion of the employer's property." *Id*. at 477. Rather, the critical

question is "whether the defendant is an employer subject to the OSHA regulation in question." *Id*.

The *Ellis* court noted that the *Teal* court never addressed that issue because DuPont conceded that it owed a duty to comply with the specific OSHA regulation at issue and that it breached that duty. *Id*. The court further noted that "*Teal* acknowledged that an employer is obligated to protect all employees working at its workplace only once that employer is deemed responsible for complying with OSHA regulations." *Id*. (internal quotations and brackets removed). "*Teal*, therefore, merely extends to employees of an independent contractor the same duty owed to one's own employees." *Id*. at 477-78.

The *Ellis* court distinguished the case before it from that presented in *Teal*. First, the court noted that there was no evidence that the communications tower was a "regular job site on which Chase had a duty to protect its own employees." *Id*. at 478. The Court determined that "Chase's status an employer in other contexts does not change the fact that, in regard to the tower, Chase was no different than a property owner hiring a contractor to perform work on its property." *Id*.

Accordingly, in determining whether NAS could be held negligent *per se* on the basis of the KOSHA violations at issue, the first issue for the Court is whether NAS was responsible for complying with the regulations that were breached. The KOSHA compliance officer Carla Cornett determined that UGS, Inc. had violated the following KOSHA or OSHA regulations:

- KOSHA regulation requiring that employees engaged in a steel erection activity who are on a walking/working surface with an unprotected side or edge ten feet or more above a lower level be protected from fall hazards by guardrail systems, safety net systems, personal fall arrest systems, positioning device systems, or fall restraint systems. 803 KAR 2:417;

- OSHA regulation requiring that employees on a walking/working surface with an unprotected side or edge which is 6 feet or more above a lower level be protected from falling by the use of guardrail systems, safety net systems, or personal fall arrest systems.. 29 CFR 1926.501(b)(1);

    - OSHA regulation requiring employers to provide and install fall protection systems for employees before that employee begins the work that necessitates the fall protection. 29 CFR 1926.502 (a)(2);

7

- OSHA regulation requiring that personal fall arrest systems be inspected prior to each use for wear, damage and other deterioration, and that defective components be removed from service.  29 CFR 1926.502(d)(21).

(DE 283, Cornett Dep., Ex. K).

In determining whether NAS was responsible for complying with these regulations, the Court will look to: 1) whether there is evidence that, at the time of the accident, the accident site was a "regular job site" for NAS; 2) whether NAS retained sufficient control of Siemens' employees or the work they were performing so as to be regarded as an employer responsible for violations of KOSHA; 3) whether the contract conferred upon Siemens both the opportunity and responsibility to assure compliance with safety regulations.

**1)     Whether the Accident Site was NAS's Regular Job Site.**

NAS argues that the site where Siemens and its subcontractor UGS were installing the electric arc furnace was physically separate from its regular job site.  The Plaintiffs, on the other hand, argue that the installation was an addition to the existing NAS melt shop.  In support of their arguments, both parties point to the deposition of NAS senior engineer Chris Breetz.  Breetz testified that NAS was adding on to its existing melt shop.  He further testified that the addition and the equipment to be installed in it had to be "up and running" before it became a production area for NAS.  (DE 253, Ex. A, Breetz Dep. at 69-70). Breetz testified that, during the installation phase, the addition was "not a normal production area" of NAS. (DE 253, Ex. A, Breetz Dep. at 71).

Thus, the addition where the furnace was being installed was much like the MeadWestcavo plant. It was being constructed to accommodate NAS's anticipated needs but there is no evidence that, at the time of the accident, it was a "regular job site" for NAS and its employees.

The Plaintiffs point out that Breetz testified that he and various NAS engineers were on the project site at various times.  However, the Plaintiffs submit no evidence that these employees were engaged in

NAS's regular work. Instead, the only evidence submitted by the parties is that the NAS employees were monitoring the progress of Siemens' work or the work of Siemens' subcontractors. For example, Breetz testified that he was project manager, which meant that he was to "make sure things got done on time on budget, safety, etc." (DE 248, Ex. B, Breetz Dep. at 11).

Thus, the NAS employees who visited the doghouse construction area were similar to the MeadWestvaco representative who was on that site daily to "insure that the contract was being carried out in accordance with the plans and specifications of the project." *Id.* at 670.

### 2) Whether NAS Controlled the Work.

The contract explicitly made Siemens solely responsible for the installation, professional design services, and supervision of the erection of the electrical arc furnace and the associated fume exhaust equipment including all labor and material. (DE 231, Ex. A, Art. 1.4).

The contract explicitly provided that Siemens would be deemed an independent contractor "with the sole authority to control the work and Project worksite, and direct the performance of the details of the manufacture, delivery and installation of the Equipment." (DE 231, Ex. A, Art. 16.8).

Thus, like the contract at issue in *MeadWestvaco*, the contract between NAS and Siemens gave Siemens "control over all construction methods and the coordination of work performed on the job site." *MeadWestvaco*, 238 S.W.3d at 669.

### 3) Whether NAS was Responsible for Compliance with Safety Regulations.

The contract explicitly required Siemens to comply with all applicable OSHA standards. (DE 231, Ex. A, Addendum 9, ¶ 1). The contract further provided that it was Siemens' responsibility to "adhere to the accepted environmental, safety and occupational health practices set forth by local, state and federal laws. . ." (DE 231, Ex. A, Addendum 9, ¶ 24). The contract also provided that "[e]nforcement of all applicable Standards, Laws, and Regulations is the responsibility of the Contractor." (DE 231, Ex. A, Addendum 9, ¶ 24).

9

Accordingly, as was the case in MeadWestvaco, the relationship between NAS and Siemens, as defined by their contract, conferred upon Siemens (and not NAS) both the opportunity and the responsibility to assure compliance with relevant safety regulations. *Id*. at 672.

The Plaintiffs point out that NAS employees Mike Tolin and Joanna Curry conducted walk throughs of the project site and corrected safety violations they observed. However, in accordance with *MeadWestvaco*, in determining whether an employer should be held negligent per se for violations of safety provisions, the focus is on whether the contract at issue gave the contractor the responsibility and opportunity to comply with the safety regulations at issue. There can be no dispute that the contract at issue here conferred upon Siemens such responsibility and opportunity.

Any assumption by NAS of the obligation to ensure compliance with the safety regulations may be relevant to a common-law negligence claim against it. However, because, under its contract with NAS, Siemens had the responsibility and opportunity to comply with the specific safety regulations that were violated, NAS cannot be held negligent per se for those violations.

**B.    Negligence Per Se for violation of OSHA's General Duty Clause.**

The Plaintiffs assert that, if NAS cannot be held negligent per se for the specific OSHA violations for which UGS was cited, then it can be held responsible for violation of OSHA's so-called "general duty clause." That clause requires each employer to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1). The *Teal* court explained that, "every employer owes this duty regardless of whether it controls the workplace, whether it is responsible for the hazard, or whether it has the best opportunity to abate the hazard." 728 F.2d at 804.

However, in *Teal*, the court also explained that, "[t]he general duty clause was intended by Congress to cover unanticipated hazards; Congress recognized that it could not anticipate all of the potential hazards that might affect adversely the safety of workers. Accordingly, it enacted the general duty clause to cover

10

serious hazards *that were not otherwise covered by specific regulations.*" *Id*. at 804 (emphasis added). Thus, "[t]he general duty clause applies when there are no specific standards." *Reich v. Montana Sulphur & Chemical Co.*, 32 F.3d 440, 445 (9th Cir.1994).

In this case, UGS, Inc. was cited for violating specific safety standards applicable to employees working a certain distance above a lower level. Thus, the general duty clause is inapplicable.

C.     **Common Law Negligence.**

As to the Plaintiffs' common law negligence claim against NAS, they appear to assert that NAS was negligent in one of two ways. The Plaintiffs assert that NAS gratuitously assumed responsibility for safety conditions at the worksite and was negligent in performing that responsibility (DE 248 at 22-23). The Plaintiffs also assert that NAS was negligent in contracting its safety responsibilities to Siemens. (DE 248 at 23).

1)     **NAS's Assumption of Responsibility for Fall Protection.**

As to NAS's assumption of responsibility for the safety of UGS employees like Dilts at the worksite, the Plaintiffs do not fully develop this argument in their response brief. The extent of their argument is a citation to *Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530 (Ky. 2003). In that case, the Kentucky Supreme Court adopted the Restatement (Second) of Torts § 324A which sets forth the elements necessary for a claim of negligence based on a voluntarily assumed duty. *Morgan v. Scott*, 291 S.W.3d 622, 632 (Ky. 2009).

Section 324A provides as follows:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a)     his failure to exercise reasonable care increases the risk of such harm, or
(b)     he has undertaken to perform a duty owed by the other to the third person, or
(c)     the harm is suffered because of reliance of the other or the third person upon the undertaking.

11

"An actor's specific undertaking of the services allegedly performed without reasonable care is a threshold requirement to section 324A liability. The scope of this undertaking defines and limits an actor's duty under section 324A." *McAtee v. Fluor Constructors International, Inc.*, 188 F.3d 508 at * 6 (6th Cir. 1999)(quoting *In re TMJ Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1493 (8th Cir.1997)).

In *McAtee*, the Tennessee Value Authority engaged the contractor, FDEC, to perform some construction at a TVA plant. *Id*. at *1.  FDEC, in turn, subcontracted with SOS to provide insulation and asbestos removal work. *Id*. FDEC also subcontracted with its wholly-owned subsidiary, FCI, to provide construction management and engineering safety services. *Id*

The plaintiff worked for the subcontractor SOS. *Id.*  He suffered a severe electrical shock on a project involving the installation of a "heat trace" wire on cold water piping. *Id*.  The plaintiff sued the subcontractor FCI on the theory that FCI assumed a duty to guard the plaintiff's safety while he was working at the TVA plant and it breached that duty by failing to ensure that the heat trace wire was disconnected before he began his work. *Id*. at *6.

The Sixth Circuit held that, under § 324A, the plaintiff had to present evidence that FCI:

> specifically undertook to render safety services with respect to Plaintiff's work near the wire, such as (i) pre-work inspection for hazards in and around SOS employee work areas, (ii) monitoring of SOS employees and their supervisors as they performed particular tasks, or (iii) actual abatement of work area hazards before SOS employees like Plaintiff began working near them."

*Id*. at *6. In other words, there must be evidence that the "defendant has specifically undertaken to perform the task that he or she is charged with performing negligently." *Id*.  (quoting *Patentas v. United States,* 687 F.2d 707, 716 (3d Cir.1982)).

The court noted that FCI  provided a general orientation program for new workers at the plant; conducted weekly tool box safety meetings; answered safety-related questions; and conducted post-accident investigations and reports. *Id*. at *7. However, the plaintiff could not demonstrate that "FCI specifically undertook to secure Plaintiff's safety with respect to the heat trace wire that injured him." *Id*. at *8.  The

12

court concluded that " FCI's conduct in holding safety meetings and generally promoting plant safety is insufficient to create a legal duty under § 324A." *Id*. The court noted that was no evidence that "FCI undertook to specifically supervise SOS employees as they worked on particular jobs." *Id*.

Later, in *Merrill v. Arch Coal, Inc.*, 118 Fed. Appx. 37 (6th Cir. 2004), the Sixth Circuit was presented with a case in which a coal miner was killed when a piece of the mine's roof fell on him. *Id*. at 38. The miner was employed by Lone Mountain Processing, Inc. which was a subsidiary of the defendant Arch. *Id*. The issue before the Sixth Circuit was whether Arch voluntarily assumed responsibility for the safety of Lone Mountain's employees. *Id*. at 43. The court concluded that "Arch's general corporate-wide safety program, safety awards and general safety guidelines are insufficient to create a duty on Arch's part." *Id*. at 44. But the court found there was evidence of a "more specific undertaking by Arch." *Id*.

> Specifically, there is evidence that Arch management was aware of roof control problems at the Darby Fork Mine, and that Lone Mountain was considering various measures to make the roof safer. Furthermore, [the] actions [of Ken McCoy, Arch's Corporate Director of Safety], went beyond mere oversight or consultation. McCoy visited the mine, went underground to look at the roof, and offered advice about roof control. He also admitted to concluding that Lone Mountain's passive roof system was adequate, and that he expressed this conclusion to Darby Fork mine manager Frazier. We think that viewing these facts in the light most favorable to Plaintiffs, a reasonable trier of fact could find that McCoy voluntarily undertook to advise Lone Mountain on its specific roof control problems in the Darby Fork Mine, and that such an undertaking was for the benefit of miners like [the deceased miner]. Therefore, we find that summary judgment was inappropriate.

*Id*. at 44-45.

Accordingly, evidence that NAS conducted general safety activities at its site is not sufficient to confer a duty under § 324A. Instead, there must be evidence that NAS specifically undertook to ensure fall protection for UGS employees like Dilts who were working on the doghouse.

On that issue, there is evidence that NAS had a fall protection policy and that it enforced it even with regards to contractor employees. Joanna Curry testified that NAS had a fall protection policy. (DE 248, Ex. C, Curry Dep. at 20). NAS's contract with Siemens provides that the Fall Protection Policy must be made available, "at the request of the contractor." (DE 231, Ex. A, Addendum 9).

13

Curry testified that, during her walkthroughs of the worksite, she did not observe fall protection at the doghouse but "did do some fall protection operations at the construction site." (DE 248, Response, Curry Dep. at 24). She testified that she would observe fall protection "just kind of now and again." (DE 248, Response, Curry Dep. at 25). She testified that this occurred maybe once a week. (DE 248, Response, Curry Dep. at 25).

She testified that she never found an employee who was not "tied off." (DE 248, Response, Curry Dep. at 26). But, she also indicated that when she found employees who were not "tied off," she would either personally inform the employee or tell the employee's foreman. (DE 248, Response, Curry Dep. at 27).

Curry testified that "at the time of the fatalities," NAS employee Mike Tolin actually escorted employees from the NAS project because of fall protection violations. (DE 248, Response, Curry Dep. at 27-28). She testified that she "believed" this occurred before the time of the accident. ((DE 248, Response, Curry Dep. at 28). However, she did not know for which company the offending employees worked. (DE 248, Response, Curry Dep. at 28).

Mike Tolin also testified that NAS did escort contractor employees off site for safety violations. (DE 248, Ex. C, Tolin Dep. at 169). He did not indicate which employees, what kinds of safety violation, and he could not remember if this occurred before the accident. (DE 248, Ex. C, Tolin Dep. at 169).

Thus, there is evidence that, "now and again," NAS employees would walk through the construction area and make observations regarding fall protection violations. Further, the NAS employees may have informed contractor employees if they were violating NAS's fall protection policy and may have escorted some violating employees out of the NAS building and this may have occurred prior to the accident.

As noted, however, under its contract with NAS, Siemens was specifically responsible for complying with all application safety regulations including those governing fall protection systems. The Plaintiffs have not produced sufficient evidence that NAS voluntarily assumed that duty despite the

14

language of the contract. There is no evidence that NAS employees installed or inspected fall protection systems on the site or that they undertook to advise Siemens or UGS with regard to fall protection systems.

Accordingly, the Court cannot find that NAS voluntarily assumed responsibility for the fall protection of UGS employees working on the doghouse.

**2) Negligent Contracting.**

The Plaintiffs argue that NAS was "negligent in attempting to shift safety responsibilities to Siemens" because it "knew that Siemens could not manage safety." (DE 248, Response at 23-24). The problem with this argument is that NAS was not responsible for the safety of the employees of its independent contractors. The general rule in Kentucky is that "an owner is not liable for injuries to an employee of an independent contractor in the performance of his job." *Smith v. Modern Transmission Development Co.*, 2004 WL 2011405 at * 1 (Ky. App. 2004). NAS cannot be held liable for shifting responsibilities to Siemens that NAS did not have.

**III.   CONCLUSION.**

For all these reasons, the Court hereby ORDERS that NAS's Motion for Summary Judgment (DE 231) is GRANTED; and NAS is DISMISSED as a party to this action.

Dated this 5th day of February, 2010.

Signed By:

*Karen K. Caldwell*  KKC

United States District Judge

15