UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at FRANKFORT

CIVIL ACTION NO. 07-38

TINA DILTS, as Ancillary Administratrix and
Personal Representative of the Estate of Rickie Dilts, et al.,                    PLAINTIFF,

v.                                       **OPINION AND ORDER**

MAXIM CRANE WORKS, L.P.,                                                         DEFENDANT .

* * * * * * * * *

This matter is before the Court on the second Motion for Summary Judgment (DE 239) filed by the Defendant Maxim Crane Works, LP and its Motion to Exclude (DE 238) the testimony of Stuart B. Nightenhelser, the Plaintiff's proposed expert.

By Order dated January 20, 2010 (DE 310), the Court ordered that Maxim's motion to exclude would be heard February 1, 2010. On January 26, 2010 (DE 313), the Plaintiffs filed a notice stating that Nightenhelser would be unable to attend the February 1 hearing. On January 28, 2010, the Court ordered that any motion to continue the hearing be filed by January 29, 2010. No party moved to continue the hearing. Accordingly, the hearing on the Motion to Exclude Nightenhelser was conducted as scheduled and Nightenhelser was not present.

I.   BACKGROUND.

In their Complaint, the Plaintiffs assert that Rickie Dilts and Matthew Collins were employed by the Defendant UGS, Inc. On or about July 28, 2006, Dilts and Collins were assigned to work at Defendant North American Stainless's plant in Carroll County, Kentucky. At the North American Stainless ("NAS") plant, Dilts and Collins were working approximately 80 feet from the ground on

the assembly of the roof of a structure referred to as the "doghouse."

The doghouse is a large steel structure built inside the factory at NAS that houses an electric arc furnace used to melt stainless steel. According to NAS, the purpose of the doghouse is to capture the fumes and exhaust produced during the melting of stainless steel in the electric arc furnace. (DE 231, Mem.. at 3). The doghouse is made of separate metal panels weighing between 1,000 and 6,000 pounds. (DE 166, Response, Ex. A, Gunn Dep. at 45; Ex. C, Corrales Dep. at 16). Dilts and Collins were re-setting the roof panel. The panel was lifted into place on the doghouse by a crane. Dilts and Collins were on the roof panel when it fell, causing them to fall 80 feet to the concrete floor. Dilts and Collins died as a result of the fall.

Dilts was wearing a safety harness when he fell but he was not tied off to a supporting structure as necessary to prevent a worker from falling. (DE 239, Mem. at 3).

The original Plaintiffs in this matter included Sandi Neace, Collins' mother, as the administrator of his estate. However, pursuant to an Agreed Order (DE148), Neace's claims were dismissed. The remaining Plaintiffs in this action are Tinna Dilts, who was Rickie Dilts's wife, and Rickie Dilts, Jr. Tinna Dilts pursues claims individually, as administrator of Dilts's estate, and as next friend of Dilts's minor children. The Plaintiffs named five defendants: UGS, Inc.; NAS; UGS, LLC; Siemens; and Maxim Crane Works, L.P.

As stated, the Plaintiffs alleged in their Complaint that UGS, Inc. was Dilts's employer. (DE 1, Complaint ¶ 2). NAS owned the factory where the incident occurred. NAS entered into a contract with Siemens requiring it to install the electric arc furnace and associated fume exhaust system. (DE 231, Ex. A, Contract, Art. 1.1, 1.2). Siemens then subcontracted with UGS, Inc. which, in turn, subcontracted with Maxim. There is no dispute that the roof panel that fell was lifted and lowered

into place by a crane owned by Maxim. The crane operator was Maxim employee Travis Gunn. (DE 116, Maxim Mot. For Summ. J. at 1).

A Kentucky OSHA compliance officer, Carla Cornett, investigated the accident site. In her report, she recommended that no citations be issued to Siemens, Maxim or NAS. She did, however, recommend that certain citations be issued to UGS, Inc. and those citations were issued.

The Plaintiffs asserted common-law negligence and negligence per se claims against all of the Defendants. However, by Opinion and Order dated September 22, 2008 (DE 137), this Court dismissed the Plaintiffs' claims against UGS, Inc., the employer of Dilts, finding that the Plaintiffs received workers' compensation death benefits from UGS, Inc.'s insurance carrier and, thus, they were barred from bringing any tort claim against UGS, Inc. under the exclusivity provision of the Kentucky Workers' Compensation Act, KRS 342.0011, *et seq*. In prior opinions, this Court also dismissed the Plaintiffs' claims against UGS, LLC; NAS; and Siemens.

Accordingly, the sole remaining defendant is Maxim. It now moves for summary judgment in its favor on both the common-law negligence and negligence per se claims asserted against it.

**II.    STANDARD.**

Under Fed. R. Civ. P. 56, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

3

demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In considering a motion for summary judgment, the court must view the facts and draw all inferences therefrom in a light most favorable to the nonmoving party. *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The moving party must show conclusively that there is no genuine issue of material fact. *Id*. However, at the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter. *Wiley v. United States*, 20 F.3d 222, 226 (6 th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249(1986)).

The Court is not to judge the evidence or make findings of fact. *60 Ivy Street Corp*., 822 F.2d at 1435-36. Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**III.   ANALYSIS.**

**A.   Common Law Negligence.**

The basis for the Plaintiffs' common law negligence claim against Maxim is that the roof "panel [Dilts] was standing on was dislodged by movement of the Maxim crane." (De 261, Mem. at 3). Thus, the issue raised by Maxim's motion for summary judgment on this claim is whether there is sufficient evidence in the record to support this theory.

4

Both parties appear to agree on what would have been the normal mode of operation by the crane operator and Dilts and Collins with regard to the panels of the doghouse. The normal procedure would have been as follows:

1) The roof panel would be connected to the crane by the UGS, Inc. employees. This would be done by connecting the panel to the "rigging" hanging from the crane's hook  The "rigging" consisted of two 6-foot nylon straps attached to the crane and shackles attached to the end of each strap. (DE 239 at 1, 2, 17; DE 256, Ex. H, Report at 3).

2) A UGS, Inc. employee would have a radio and either give radio signals or hand signals to the crane operator to move the panel (DE 239 at 2);

3) The crane operator would lower the panel onto the supporting steel structures and next to the previously installed panels (DE 239 at 2; DE 261 at 9);

4) The UGS, Inc. employees would then "set" the panel (DE 261 at 9, 17; DE 239 at 17);

5) The UGS, Inc. employees would direct the crane operator to put more of the weight of the panel onto the supporting structures so that the crane was bearing less of the weight while the panel was welded (DE 261 at 9, 25; DE 239 at 2);

6) The panel would then be welded into place by UGS, Inc.'s employees (DE 239 at 2);

7) The UGS, Inc. employees would direct the crane operator to lower the cable of the crane to allow the rigging attached to the panel to become slack so the panel could be disconnected from the crane (DE 239 at 17);  and

8) The UGS, Inc. employees would then disconnect the rigging from the crane and direct the crane operator to swing away. (DE 239 at 2-3, 17; DE 261 at 8).

As the Court noted in its opinion on Maxim's first motion for summary judgment, UGS Inc. foreman Scott McMahan testified that UGS Inc. employees gave Gunn directions as to whether he needed to "cable up," "cable down," "swing here," or "swing there." These directions were given by hand signals when the lift was in Gunn's vision. (DE 166, Response, Ex. H. McMahan Dep. at 140). On the day of the accident, however, Dilts gave these signals to Gunn by radio because Gunn

was working "in the blind," meaning Dilts and the lift were out of Gunn's vision. (DE 166, Response, Ex. H. McMahan Dep. at 140). McMahan testified that Gunn would not move the crane unless he got direction from UGS Inc. employees. (DE 166, Response, Ex. H. McMahan Dep. at 142).

### 1) Undisputed Events.

There does not appear to be any dispute that steps one through five enumerated above occurred, meaning that the roof panel was "set."

The panel weighed about 3,800 pounds. It was approximately 27 feet long (the "long ends"), 7 feet wide (the "short ends"), and 1 foot tall. (DE 261 at 14). The Plaintiff's proposed expert Stuart Nightenhelser explains how the panels were connected to the crane:

> Panels were lifted by two 6-foot nylon straps attached to the crane rigging. At the end of each strap was an anchor shackle. The screw pins of the two shackles were inserted through lugs that had been welded in place on the panel for the purpose of lifting the panel. . . The welded lugs were positioned along the longitudinal centerline of the panel so that the panel would balance during lifting.

(DE 256, Ex. H, Report at 3).

On the day of the incident, some of the walls of the doghouse had been constructed including the east wall. The panel was to be set on the roof to span the space between an I-beam and the east wall. (DE 261, Response at 14; DE 256, Ex. H., Nightenhelser Rep. at 3). The I-beam spanned the center of the room from north to south. (DE 261 at 14; DE 256, Ex. H., Nightenhelser Rep. at 3). When the panel was set, one of the short ends of the panel would rest on top of the east wall and the other was to rest on the lower flange of the I-beam. (DE 261, Response at 14).

The crane lowered the panel into a position that was east of its final resting position. This

6

was so the panel would not hit the upper flange of the I-beam as it came down. (DE 261, Response at 5). Once the panel was dropped and cleared the upper flange of the I-beam, Dilts and Collins manually "pushed" it into the I-beam channel so that it rested on the lower flange of the I-beam. (DE 261, Response at 5).

After one short end of the panel was pushed into the I-beam channel, then the other short end was lowered onto the wall panels. (DE 261, Response at 5). The only individuals other than Dilts and Collins who were on the roof of the doghouse at the time of the accident were Lori Day and Roger Perry, employees of James Welding. They testified that they watched Dilts push the panel into the I-beam channel. (DE 261, Response at 4-5).

There is no dispute that, after the panel was set, Dilts signaled Gunn to "cable out" to put more of the weight of the panel on the supporting structure. (DE 261, Response at 9).

There is no evidence that either party has pointed to in the record that would indicate that step six occurred. The Plaintiffs appear to concede that the panel was not welded into place. (DE 261 at 22). Thus, the only inference that can be drawn from the record is that neither Dilts nor Collins welded the panel into place.

There is no dispute that step seven did occur. Dilts and/or Collins directed Gunn to cable down to allow the rigging to become slack. There is evidence in the record that Collins removed the pin from one of the shackles and removed that shackle from the panel. (DE 261, Response at 5; DE 239, Mem. at 19). Though neither party has pointed to any eyewitness testimony that both rigging straps were completely disconnected from the panel, it appears to be the theory of both parties that the second rigging strap was also disconnected from the panel.

Some time after Gunn cabled down to allow the rigging to become slack and the panel was

disconnected from the crane, the panel fell. The Defendant has produced evidence that Gunn was never instructed to raise the boom of the crane and swing the boom away from the area where Dilts and Collins were working. (DE 239 at 18). The Plaintiff does not dispute this.

### 2) Disputed Events.

Thus, it is undisputed that, after setting the roof panel into the I-beam channel and onto the east wall, Dilts and Collins detached the panel from the crane and that the panel was never welded into place. The dispute between the parties is what caused the detached, unwelded panel to fall.

The Plaintiffs assert that Gunn raised the crane, or "cabled up," after the panel was disconnected from it and that some portion of one of the shackles with the pin partially reinserted in it caught the panel and lifted it. Maxim and Gunn assert that the last direction Gunn got was to cable down and that this was the last action he took. (DE 239 at 17-18). As support for its theory, the Plaintiffs rely on the opinion of their expert, Stuart B. Nightenhelser. Maxim has moved to exclude Nightenhelser's testimony.

### a) Nightenhelser's Opinion.

Nightenhelser has a bachelor of science degree in physics and mathematics. He worked for years as a research physicist for the Naval Avionics Center. For the last 16 years he has worked for Wolf Technical Services, Inc., a company specializing in forensics and accident reconstruction. Nightenhelser states he performed accident reconstruction for 10 years. He asserts that he has investigated over 1,000 accidents involving many kinds of vehicles.

In his report, Nightenhelser opines that the panel must have been lifted by the crane. The Court has reviewed Nightenhelser's report (DE 256, Ex. H) and deposition (DE 241) and has considered the arguments of the Plaintiffs' counsel in the Plaintiffs' briefs and at the hearing on the

motion to exclude to determine how Nightenhelser arrives at this conclusion.

Nightenhelser begins his report by stating that he believes that, after the panel became dislodged, the panel rotated and the top of it hit a handrail below the panel. He bases this conclusion on damage that occurred to one of the corners of the panel and to a handrail that was mounted on a lower catwalk along the west side of the room.

Nightenhelser states that a photographic analysis shows that, during the panel's fall, there was "contact damage" between the top of the panel at its northeast corner and the handrail. For this portion of Nightenhelser's opinion, he has to begin with an understanding of the manner by which the panel was positioned when it was "set." In other words, he has to have some basis for determining that the damaged corner was the northeast corner of the panel when it was in its set position.

Though Nightenhelser does not explain in his report what the basis for this determination is, at the hearing on the motion to exclude, the Plaintiffs' counsel stated that Nightenhelser's opinion that the damaged corner was the panel's northeast corner when it was "set" was based on Scott McMahon's deposition testimony as to the orientation of the panel when it was set.

Nightenhelser concludes, based upon an inspection of photographs of the panel and the rail, that the panel hit the rail top down. Thus, the panel had to have rotated in a manner that brought the northeast corner to the west side of the room where the damaged handrail was.

In his report, Nightenhelser opines that the way this occurred was that the west end of the panel fell first, off of the I-beam. The west end of the panel fell downward and the east end of the panel rotated upward until the northeast corner fell top down onto the rail. Nightenhelser explains:

The configuration of the damage and the geometry of the panel and rail indicate that

9

the panel rotated end over end upon dropping out of position, with its west end rotating downward and its east end rotating upward (counter-clockwise rotation as viewed from the south).

(DE 256, Ex. H, Report at 4).

In his report, Nightenhelser states that a ductwork structure was mounted directly beneath and in contact with the ceiling panels "along the west wall of the doghouse." (DE 256, Ex. H, Report at 4). Nightenhelser testified in his deposition the ductwork was mounted along the "east wall" of the doghouse. (DE 241, Nightenhelser Dep. at 107). Likewise, in their response to the Motion to Exclude, the Plaintiffs assert that the ductwork ran directly below the wall end of the panel. (DE 256 at 11). Accordingly, the Court has presumed that this is what Nightenhelser intended.

Nightenhelser states:

Photographs and video of the top of the ductwork shows no signs of loading or scraping contact as would be the case had the west end of the panel simply fallen off the I-beam support without being lifted, allowing the panel to fall onto the duct. In addition, there are no scrapes or contact marks on the west end of the panel or on the underside of the panel at the east end. The lack of any physical evidence of such contact is an indication that the panel was lifted out of its position by the crane during the cable up function. This finding is consistent with the observations of two independent witnesses above the ceiling structure that the shackles were positioned several feet above the ceiling structure after the panel and the men fell.

(DE 256, Ex. H, Report at 4).

The two witnesses that Nightenhelser is referring to are Day and Perry. Day testified that, after the accident, the crane's shackles were not hanging below the hole where the roof panel that fell had been. She was not certain how far the shackles were hanging above the hole. (DE 261, Response, Ex. A, Day Dep. at 36, 37, 52, 54, 55). Perry testified that the shackles were hanging anywhere from three to five feet above the hole. (DE 261, Response, Ex. B, Perry Dep. at 32, 33, 44, 133).

In the passage of his report quoted above, Nightenhelser opines that the panel could not have simply fallen or slipped off of the west end without causing damage to the ductwork on the east end and/or damage to the west end of the panel or the underside of the panel at its east end. Nightenhelser states he found no signs of such damage in the videotape or photographs of the accident scene and then concludes that the panel must have been lifted by the crane.

As to how the crane lifted the panel when the two were no longer connected, in his deposition, Nightenhelser stated that it is his opinion that some part of the pin that was lying on the ground could have caught on some part of the panel and lifted it up. (DE 241, Dep. at 154-55).

In his report, Nightenhelser explains that this conclusion is based on the following:

> Photographs and video show the damaged screw pin (which was apparently not preserved as evidence along with the rest of the rigging) lying on the floor of the doghouse. The photos show an area on the threaded portion of the pin where the threads appear to be sheared off at a bevel angle. The damage that is shown is consistent with loading of the pin that would occur had the pin caught on a portion of the panel and lifted it out of place.

(DE 256, Ex. H, Report at 4).

### b)    Maxim's Motion to Exclude Nightenhelser's Opinion.

Maxim moves to exclude Nightenhelser's opinion, arguing that his conclusions are based on "speculation" and "guesswork" and that he never explains the methodology used in forming these opinions. Maxim complains that Nightenhelser "made no measurements" and "made no calculations" in arriving at his conclusion that the panel must have been lifted.

Rule 702 of the Federal Rules of Evidence requires that the testimony of an expert be based on sufficient facts or data, that the testimony be the product of reliable principles and methods, and that the witness must apply the principles and methods reliably to the facts of the case.

11

In *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Court clarified that expert testimony is admissible only if it is both relevant and reliable. *Daubert*, 526 U.S. at 589; *Kumho Tire*, 526 U.S. at 147.

As to reliability, a witness must first establish that he is qualified on the basis of "knowledge, skill, experience, training, or education." *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000)(citing Fed. R. Evid. 702). The Court then must "determine whether the principles and methodology underlying the testimony itself are valid." *Id*. The court is not to "second guess the validity of conclusions generated by otherwise valid methods, principles, and reasoning." *Id*. The party proffering the expert testimony must prove its reliability and relevancy by a preponderance of the evidence. *Id*.

"[A]n expert opinion must set forth facts and, in doing so, outline a line of reasoning arising from a logical foundation." *Brainard v. American Skandia Life Assur. Corp.*, 432 F.3d 655, 663-64 (6th Cir. 2005)(internal quotation marks and citations omitted).

Nightenhelser first concludes that the manner in which the panel rotated was that the I-beam end or west end fell first. There is no indication in his report as to why he forms this belief. In his deposition, Nightenhelser stated that "at the wall end of the panel, you've got some ductwork there which would have prevented that end from falling first." He states that the ductwork would have prevented the panel from rotating clockwise. (DE 241, Nightenhelser Dep. at 107).

The Plaintiffs point to no portion of Nightenhelser's report or his deposition in which he explains why the ductwork would have prevented the wall end – or east side – of the panel from falling first or why the ductwork would have prevented it from rotating clockwise. The Court has been unable to locate any such explanation in his report or deposition.

As to Nightenhelser's conclusion that the panel was lifted out of its position by the crane, Nightenhelser states that this conclusion is also based the fact that there was no evidence of contact on the ductwork and "there are no scrapes or contact marks on the west end of the panel or on the underside of the panel at the east end." However, again, Nightenhelser does not explain in his report why the fact that there are no contact marks on the ductwork or panel indicates that the panel must have been lifted out of its position.

Thus, Nightenhelser's opinion leaps to two crucial conclusions without any real explanation: that the wall end of the panel fell first and that the panel must have been lifted out of its position.

Nightenhelser's report does not indicate that his conclusions depend in any manner on the size of the panel or the space in which it fell. In an affidavit submitted with the Plaintiffs' response to the motion to exclude, Nightenhelser states that his conclusions are based on "sound physics, principles, and calculations." (DE 256, Response, Ex. B). However, he provides no explanation of what those physics, principles, or calculations might be.

Though not mentioned in his report, in his deposition, Nightenhelser further explained that his conclusion that the panel was moved by the upward movement of the crane was based on his opinion regarding the amount of lateral force that would have been required to dislodge the panel. Nightenhelser opined in his deposition that it would take at least 700 pounds of lateral force to move the panel. He reached this conclusion by multiplying the minimum weight of the panel, i.e., 2,000 pounds, by the coefficient of friction for "fairly slick" steel on steel which he stated was three-tenths. (DE 241, Dep. at 143-45).

In his deposition, however, Nightenhelser also noted that the panel could have been moved by "sleever bars." Specifically, Nightenhelser stated "[t]hey were obviously able to move them

13

around a bit with those sleever bars." (DE 241, Dep. at 137). He also testified that "[y]oul could knock [the panel] somewhere with a sledgehammer several times, that could do it. There are ways to get it to move, but not any that make sense." (DE 241, Dep. at 137).

Presumably, Nightenhelser's belief that these other manners by which the panel could have been moved make no sense rests on his conclusion in his report that the "ductwork shows no signs of loading or scraping contact as would be the case had the west end of the panel simply fallen off the I-beam support." Again, however, Nightenhelser does not explain why the ductwork would have shown signs of loading or scraping had something other than the crane caused the west end of the panel to move off the I-beam.

As to any evidence that the crane moved the disconnected panel by a pin that caught a portion of the panel and lifted up on it, Nightenhelser is the only such evidence that the Plaintiffs offer.

After the accident, one of the crane's shackles still had the pin in it. The pin of the other shackle was videotaped lying on the ground although at some point it disappeared from the accident scene. Thus, neither party has been able to examine the pin itself.

In his deposition, Nightenhelser stated that it is his opinion that the pin that was lying on the ground "could have" caught on some part of the panel and lifted it up. (DE 241, Dep. at 154-55). He states that the panel "could have caught either end of the pin on one of those lips." (DE 241, Dep. at 155).

In his report, Nightenhelser states the following:

Photographs and video show the damaged screw pin (which was apparently not preserved as evidence along with the rest of the rigging) lying on the floor of the doghouse. The photos show an area on the threaded portion of the pin where the

14

> threads appear to be sheared off at a bevel angle. The damage that is shown is consistent with loading of the pin that would occur had the pin caught on a portion of the panel and lifted it out of place.

(DE 256, Ex. H, Report at 4).

In his deposition, Nightenhelser testified that he does not know precisely where the pincaught onto the panel or how it happened. (DE 241, Dep. at 184, 188-89). In his report and deposition, he points to no evidence supporting his theory that the pin caught the panel, other than the still picture of the pin after the accident.

Nightenhelser's conclusion that the pin may have caught on the panel and moved it rests on the assumption that the shackle that lifted the panel held a partially reinserted pin and that this was the pin lying on the ground after the accident. However, there is no evidence that the pin was partially reinserted into the shackle before the accident. Thus, Nightenhelser's conclusion that the panel was moved by the partially reinserted pin is not based on any factual evidence in the record. Further, Nightenhelser states that the still picture of the pin is "consistent with" his theory that the pin caught the panel. However, he provides no explanation of that conclusion.

For all these reasons, the Court will GRANT Maxim's motion to exclude the testimony of Nightenhelser.

### 3) Maxim is Entitled to Judgment on the Common Law Negligence claim.

Without Nightenhelser's conclusion that the panel must have been lifted out of its position, there is not sufficient evidence in the record to create an issue of fact as to whether the panel was lifted by the crane. Accordingly, Maxim is entitled to summary judgment on the Plaintiffs' common law negligence claim.

More importantly, *even if Nightenhelser's opinion were not excluded*, Maxim would be

15

entitled to summary judgment on this claim. This is because, under Kentucky law, in a negligence action, the plaintiff must present evidence that the negligent acts were the "probable cause" of the injury, not simply the "possible cause." *Midwestern V.W. Corp. v. Ringley*, 503 S.W. 2d 745, 747 (Ky. 1973); *Hans v. Matrixx Initiatives, Inc.*, 2007 WL 2668594 at *3 (W.D.Ky. 2007).

Nightenhelser testifies that it is only possible that the partially reinserted pin caught some portion of the panel and moved it. There is no other evidence in the record from which the jury could infer that it is "probable" that this is how the panel was moved. Nor is there any evidence in the record of any other manner by which the crane could have moved the panel. Accordingly, because there is no evidence in the record from which the jury could infer that the crane probably moved the panel, Maxim is entitled to summary judgment on the common law negligence claim against it, even if Nightenhelser's testimony were to be admitted.

      **B.**      **Negligence Per Se.**

Under Kentucky law, violations of state and federal occupational safety and health statutes ("KOSHA" and "OSHA," respectively) can constitute negligence per se if the plaintiff is within the class of person the statute is intended to protect. *Hargis v. Baize*, 168 S.W.3d 36, 45 (Ky. 2005). In *Hargis*, the court determined that KRS 446.070, which authorizes a private right of action for violations of Kentucky statutes, "converts the standard of care required by the violated statute into a statutory standard of care for the negligence claim, the violation of which is negligence per se." *Id*.

In *Pennington v. MeadWestvaco Corp.*, 238 S.W.3d 667 (Ky. App. 2007), the defendant MeadWestvaco owned the work site where the plaintiff was injured. *Id*. at 668. MeadWestvaco was renovating its physical plant and a company called Jenkins-Essex Construction Co. was the

16

renovation contractor. *Id*. Jenkins-Essex entered into a subcontract with Mead Paining, which was the employer of the plaintiff. *Id*. at 670.

The plaintiff was injured while working at MeadWestvaco's site and asserted a negligence claim against it. The court noted that the plaintiff's negligence claim was based on MeadWestvaco's alleged failure to comply with certain KOSHA regulations. *Id.* at 670. The court determined that the property owner MeadWestvaco could not be considered an "employer" for purposes of the KOSHA regulations.

In support of this conclusion, the court noted the following: 1) MeadWestvaco had purchased the plant where the accident occurred to accommodate its anticipated manufacturing needs, but there was no evidence that, at the time of the accident, it was a "regular job site" for MeadWestvaco; 2) MeadWestvaco had ultimate control of the premises because it owned it but it did not "retain sufficient control of the subcontractor's employees or the painting of the facility" to be regarded as an employer responsible for violations of KOSHA; and 3) the contract conferred upon the subcontractor Jenkins-Essex both the opportunity and responsibility to assure compliance with safety regulations. *Id*. at 672.

In this case, the KOSHA compliance officer Carla Cornett determined that UGS, Inc. had violated the following KOSHA or OSHA regulations:

- KOSHA regulation requiring that employees engaged in a steel erection activity who are on a walking/working surface with an unprotected side or edge ten feet or more above a lower level be protected from fall hazards by guardrail systems, safety net systems, personal fall arrest systems, positioning device systems, or fall restraint systems. 803 KAR 2:417;

- OSHA regulation requiring that employees on a walking/working surface with an unprotected side or edge which is 6 feet or more above a lower level be protected from falling by the use of guardrail systems, safety net systems,

17

>or personal fall arrest systems.. 29 CFR 1926.501(b)(1);

- • OSHA regulation requiring employers to provide and install fall protection systems for employees before that employee begins the work that necessitates the fall protection. 29 CFR 1926.502 (a)(2);

- • OSHA regulation requiring that personal fall arrest systems be inspected prior to each use for wear, damage and other deterioration, and that defective components be removed from service. 29 CFR 1926.502(d)(21).

(DE 283, Cornett Dep., Ex. K).

There is no evidence that any other safety regulations or statutes were violated.

In accordance with *MeadWestvaco*, in determining whether Maxim was responsible for complying with the regulations that were found to be violated, the Court will look to: 1) whether there is evidence that, at the time of the accident, the accident site was a "regular job site" for Maxim; 2) whether Maxim retained sufficient control of UGS Inc.'s employees or the work they were performing so as to be regarded as an employer responsible for the violations of KOSHA with which UGS, Inc. was charged; 3) whether the contract between UGS, Inc. and Maxim conferred upon either party both the opportunity and responsibility to assure compliance with safety regulations.

The accident occurred on property owned by NAS. There is no evidence that it was a regular job site for Maxim. There is no evidence that Maxim or Gunn controlled the work of UGS, Inc.'s employees. Finally, the contract between Maxim and UGS, Inc. conferred upon UGS, Inc. both the opportunity and responsibility to assure compliance with safety regulations, specifically providing that "[l]essee shall comply with and conform to all laws, regulations, ordinances, rules and orders. . . relating to the possession, transportation and use of the Equipment including but not limited to all OSHA laws and regulations." (DE 166, Ex. M). There is no provision in the Maxim-

UGS contract making Maxim responsible for inspecting, installing, or providing fall protection systems for UGS, Inc. employees.

Accordingly, Maxim was not responsible for complying with the safety regulations that were breached. The Plaintiffs' negligence per se claim will therefore be dismissed.

### IV. CONCLUSION.

For all these reasons, the Court hereby ORDERS as follows:

1) Maxim's Motion in Limine to Exclude Testimony of Expert Witness Stuart Nightenhelser (DE 238) is GRANTED;

2) Maxim's Motion for Summary Judgment (DE 239) is GRANTED;

3) Maxim's Motions to Exclude (DE 337, 338, 339, 340) certain evidence at the trial of this matter are DENIED as moot; and

4) the Plaintiffs' Motion for Reconsideration (DE 301); Motion to Continue further proceedings in this matter (DE 321); and Motion in Limine (DE 336) are DENIED as moot.

Dated this 24th day of February, 2010.



Signed By:
*Karen K. Caldwell*
United States District Judge